J-A03012-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.E.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.R., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1062 MDA 2020 |

Appeal from the Decree Entered July 28, 2020
In the Court of Common Pleas of York County Orphans' Court at No(s):
2020-0008a

| | | |
|---|---|---|
| IN THE INTEREST OF: R.C.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.R, FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1063 MDA 2020 |

Appeal from the Decree Entered July 28, 2020
In the Court of Common Pleas of York County Orphans' Court at No(s):
2020-0009a

| | | |
|---|---|---|
| IN THE INTEREST OF: R.C.R. , A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.R., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1072 MDA 2020 |

Appeal from the Order Entered July 29, 2020
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000078-2018

J-A03012-21

| | | |
|---|---|---|
| IN THE INTEREST OF: J.E.R., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.R., FATHER | : : : : : : : : | No. 1073 MDA 2020 |

Appeal from the Order Entered August 27, 2020
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000154-2015

BEFORE:  LAZARUS, J., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                    **FILED MARCH 17, 2021**

J.R. (Father) appeals from the orders changing the permanency goal from reunification to adoption with respect to his son, J.E.R. a/k/a J.R., born in October of 2014, and his daughter, R.C.R., born in September of 2016 (collectively, Children), and the decrees involuntarily terminating his parental rights to the Children.[1]  We affirm.

Father's son, J.E.R., was first adjudicated dependent in August of 2015, and removed from Mother's custody due to her drug and alcohol use. Stipulation of Counsel, 7/14/20, at ¶ 23.  At that time, Father was

_____

[1] The Children's mother, A.C.R. (Mother), died on July 3, 2020, shortly before the subject proceeding.  Stipulation of Counsel, 7/14/20, at ¶ 2.

- 2 -

incarcerated. Trial Court Opinion, 9/17/20, at 4. The court terminated J.E.R.'s dependency in January of 2016. Stipulation of Counsel, 7/14/20, at ¶ 23.

However, J.E.R. was again adjudicated dependent, along with his younger sister, R.C.R., on March 28, 2018, and the Children were removed from Mother's custody. *Id.*; Stipulation of Counsel, R.C.R., at ¶ 11.[2] The Children were returned to Mother on June 14, 2018, and their dependencies were terminated on August 2, 2018. *Id.*; Stipulation of Counsel, R.C.R., at ¶ 12.

Soon thereafter, in October of 2018, York County Offices of Children, Youth and Families (CYF or Agency) received a report that Mother's alcohol and substance abuse continued. *Id.* CYF confirmed the report, and the court placed the Children in CYF's custody on December 14, 2018. *Id.*; Stipulation of Counsel, R.C.R., at ¶ 14.

At that time, Father was incarcerated at State Correctional Institute (SCI) Coal Township for aggravated assault he committed in 2016. *Id.*; N.T., 7/28/20, at 17. Father was sentenced on April 1, 2016 to minimum incarceration of eight years and a maximum of sixteen years. N.T., 7/28/20, at 17, 52.

_____

[2] For purposes of the termination proceeding, CYF's counsel and Father's counsel entered into separate stipulations for the Children, which were filed at J.E.R.'s and R.C.R.'s separate dockets.

On December 27, 2018, the court adjudicated J.E.R. dependent for the third time, and R.C.R. dependent for the second time. Stipulation of Counsel, 7/14/20, at ¶ 24; Stipulation of Counsel, R.C.R., at ¶ 17. Since then, the Children have resided together in the same pre-adoptive foster home. N.T., 7/28/20, at 27, 35.

The court set reunification as the Children's permanency goals. Father was to maintain contact with CYF; provide CYF with any family resources for the Children; and participate in appropriate classes offered by the prison. N.T., 7/28/20, at 16, 39. Father testified that he completed the following prison programs: "Inside Out Dads," which helped him learn to communicate with the Children from prison; anger management; and violence prevention. *Id.* at 53–58. Father testified he is currently participating in a state automotive program. *Id.* at 55.

Pursuant to juvenile court orders, CYF was directed to facilitate visits between Father and the Children at the prison either in person or through Zoom technology. N.T., 7/28/20, at 18. In November of 2019, the court ordered CYF to facilitate two visits per month. *Id.* at 18. On March 16, 2020, Father filed a petition for contempt, alleging that CYF failed to facilitate the supervised visits. Stipulation of Counsel, 7/14/20, at ¶ 29; N.T., 7/28/20, at 17–18. Following a hearing in May of 2020, the court found CYF in contempt. *Id.* at ¶ 31; N.T., 7/28/20, at 18.

In the interim, on January 14, 2020, CYF had filed petitions to change the Children's goals to adoption and involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). A hearing on both petitions occurred on July 28, 2020,[3] during which CYF presented the testimony of caseworker Brandon Ambrose by Zoom. Father testified by telephone.

Mr. Ambrose testified, in part, that the Children had one visit at the prison with Father in November of 2019, one visit in December, and one visit in January of 2020. N.T., 7/28/20, at 18–19. Mr. Ambrose testified that R.C.R. asked on the way to the prison in January of 2020, "will they kill me there?" *Id.* at 24. As to J.E.R. and the final in-person visit in January of 2020, Mr. Ambrose stated that "he just wanted to go straight to somewhere else. He did not want to be there. In the prison lobby when they finally arrived at the prison, [J.E.R.] said he had a bad dream that he didn't obey the rules, and the police came and took him to jail." *Id.* In February of 2020, the court temporarily suspended the in-person visits, with Father to have visitation by Zoom. *Id.* at 19, 25, 47.

By orders dated July 28, 2020 (but not entered on the docket until July 29, 2020 as to R.C.R. and August 27, 2020 as to J.E.R.), the court changed the Children's permanency goals to adoption. The court also involuntarily

---

[3] The Children's best interests were represented by a guardian *ad litem* (GAL), and their legal interests were represented by separate counsel.

terminated Father's parental rights by decrees dated and entered on July 28, 2020. Father timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b); this Court consolidated the appeals *sua sponte*.

On appeal, Father presents two issues for our review:

Did the Lower Court abuse its discretion and err as a matter of law in changing the goal from reunification with the parent to adoption?

Did the Lower Court abuse its discretion and err as a matter of law as [CYF] failed to meet its burden to terminate Father's parental rights?

Father's Brief at 5.

We review goal change orders for an abuse of discretion. ***In the Interest of D.R.-W.***, 227 A.3d 905, 917 (Pa. Super. 2020). In so doing, we must accept the court's factual findings and credibility determinations if the record supports them, but need not accept the court's inferences or legal conclusions. ***Id.***

At permanency review hearings for dependent children removed from the parental home, a court must consider the following factors set forth in the Juvenile Act, 42 Pa.C.S. § 6301 *et seq.*, in relevant part:

**(f) Matters to be determined at permanency hearing.—**

At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6)  Whether the child is safe.

. . .

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

   (i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

   (ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

   (iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time

> frames set forth in the permanency plan.
>
> . . .
>
> **(f.1)** *Additional determination.* — Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
>
> . . .
>
> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.
>
> . . .

42 Pa.C.S. § 6351(f)(1)-(6), (9); (f.1)(2).

"These statutory mandates clearly place the trial court's focus on the best interests of the child." **In re S.B.**, 943 A.2d 973, 978 (Pa. Super. 2008) (citation omitted). "Safety, permanency, and well-being of the child must take precedence over **all** other considerations." **Id.** (citation omitted) (emphasis in original). Moreover, "the burden is on the child welfare agency . . . to prove that a change in goal would be in the child's best interest." **In re R.I.S.**, 36 A.3d 567, 573 (Pa. 2011).

In his first issue, Father argues the evidence does not support changing the Children's goal to adoption. Specifically, Father argues the Children "were not given a chance to have a relationship with [him] or the family resources that [he] proposed." Father's Brief at 14–15. With respect to the lack of a bond between Father and the Children, Father asserts:

Father requested visits in March of 2019. At that time, the [C]hildren were very young. No visits were set up between that date and November of 2019. A period of eight months for children that age is very important. [CYF] did nothing to bolster the bond and then argues that there is no bond. The court erred in saying that this is permissible. It is very easy to sit back and say Father is incarcerated so no matter what else happened, that is all that matters. It is argued that this reasoning is wrong and to ignore the failures of [CYF] serves to harm the [C]hildren. It is in the best interests of the [C]hildren to know the paternal side of the family.

*Id.* at 15.

Conversely, the court opined that although Father complied with the permanency plan and the Agency was found in contempt for failing to facilitate visits after Father requested them, "Father is wrong to assume . . . that it is not appropriate to set a goal which seems to be plainly in the best interests of the [C]hildren." Trial Court Opinion 9/17/20, at 14. After careful consideration, we agree.[4]

At the time of the underlying proceedings, J.E.R. was five years old and R.C.R. was three years old. The record indicates that Father has been incarcerated throughout the Children's lives, and has never provided for the Children's care. The Children's safety and security was unstable until December of 2018, when they were placed with their pre-adoptive foster

---

[4] We likewise recognize and expressly disapprove the Agency's failure to facilitate in-person or Zoom visitation with Father as ordered by the court in prior proceedings.

parents, who provide for all of their needs, and with whom they share a parental bond. N.T., 7/28/20, at 29, 33.

Father testified that his minimum sentence date is April 1, 2024, and there is no guarantee he will be released on that date. *Id.* at 52, 70. The court stated:

> It is incontrovertible that while Father has not been a bad actor as far as the <u>care</u> of his children is concerned, and he is likely right that were it not for his incarceration that the children might be placed with him, the reality is that he has not been a resource for placement of the children, nor will be for at least four more years.

Trial Court Opinion, 9/17/20, at 7 (underline in original).

Upon review, the evidence supports the court's determination that the Children's safety, permanency, and well-being compels a goal change, such that we discern no abuse of discretion.

In his second issue, Father argues the court abused its discretion in terminating his parental rights, which is also our standard when reviewing involuntary termination. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between

parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the involuntarily termination of parental rights. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Notably, we find the court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(5) and (8), because the Children were not removed from his care due to his incarceration. Rather, the Children were removed from Mother's care. ***See In re C.S.***, 761 A.2d 1197 (Pa. Super. 2000) (*en banc*) (stating that Section 2511(a)(5) and (8) did not provide a basis for terminating the father's parental rights where he was incarcerated at the time of the child's removal from the mother's care).

However, the certified record supports the termination pursuant to Section 2511(a)(2) and (b), which provides:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .

- 11 -

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

This Court has explained that the moving party must produce clear and convincing evidence with respect to the following elements to terminate parental rights pursuant to Section 2511(a)(2): (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

With respect to Section 2511(a)(2), parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 340 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* Further, the grounds for termination under Section

2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal **as well as incapacity to perform parental duties**. *Id.* at 337 (bold emphasis added).

In *In re Adoption of S.P.*, 47 A.3d 817, 826–827 (Pa. 2012), our Supreme Court addressed incarceration as it pertains to termination under Section 2511(a)(2). The Court held that "incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2), where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied." *In re Adoption of S.P.*, 47 A.3d at 828.

With respect to Section 2511(b), we have explained, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the

particular case." ***In re K.Z.S.***, 946 A.2d 753, 762–763 (Pa. Super. 2008)

(citation omitted).

Instantly, Father asserts:

There is no doubt that Father will remain incarcerated for a few more years. It is also understood that the [c]ourt must consider permanency for the [C]hildren. However, permanency does not mean expediency. Father is working on his issues and is also working on a trade. He testified that he has housing once he is released from incarceration. It is argued that Father can and is remedying the conditions which resulted in placement of the [C]hildren.

Father's Brief at 22–23.

Conversely, the orphans' court found, "Father is clearly an unavailable resource for the [C]hildren, and is utterly incapable of providing the [C]hildren with parental care, control, and subsistence. . . . [I]t is plainly the case that try as he might, Father is not and will not be available for years to come. This is a defect in his ability to provide for the best interests of the [C]hild[ren] that again, critically, cannot be remedied." Trial Court Opinion, 9/17/20, at 10. As the record indicates Father's minimum date of incarceration is April 1, 2024, and his maximum date is April 1, 2032, we find no error. The court reasoned:

While incarceration alone cannot support a termination of parental rights, it is important to recognize the role that incarceration plays in confounding parents' attempts to perform parenting duties for their children. This opinion . . . means that although mere circumstances such as incarceration cannot be the sole basis for termination, neither are those factors to be ignored for the role they play in a parent's attempt to perform parental duties. One way or another, Father's actions have left him incarcerated, and when individuals take actions which leave them incarcerated, one

of the consequences of those actions is that they may face a much higher challenge as they attempt to perform parenting duties . . .

*Id.* at 9-10.

Our courts have long held that we "cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen (18) months, in which to *complete* the process of either reunification or adoption for a child who has been placed in foster care." **In re Adoption of R.J.S.**, 901 A.2d 502, 513 (Pa. Super. 2006) (citation omitted) (emphasis in original). Thus, we conclude that the court did not abuse its discretion in finding determinative Father's remaining four years, at minimum, of incarceration.

With respect to Section 2511(b), Father argues "the best interests of the [C]hildren would have been served by enhancing the bond with Father. These children were not given the opportunity to bond with their Father and blame for this must fall on the Agency. Add to that the fact that family resources set forth by Father were not even considered by the Agency." Father's Brief at 23–24.

In his brief as well as his testimony, Father disregards his responsibility for the lack of bond between him and the Children, and his ongoing parental incapacity. At the time of the hearing, four years remained on Father's minimum sentence, and twelve years remained on his maximum. On cross-examination by CYF's counsel, Father testified:

Q. And it's my understanding that your testimony is that you think is appropriate for your two children to have to wait another four years [to be reunified]? . . .

A. Well, no, I don't think of it in those terms at all. I think it's highly, highly inappropriate to attempt to box their natural-born father out of the equation and put them with people who are up to not that long ago complete strangers to them. So I think that they should get the same opportunity that any other child would get, that they are in foster care for as long as it takes for the situation to resolve itself. It is usually someone addicted to a substance or homeless or can't find a job. They need parenting classes. As soon as the problem resolves itself, my incarceration, I don't see why I wouldn't and my children wouldn't have the same opportunity to reunify as other children.

Q. I'm sorry if I don't understand. Your testimony is you think it is appropriate for them to have to wait another four years; is that correct?

A. I don't understand what you mean by have to wait.

Q. Well, the soonest you can be released, I believe, [i]s April of 2024, and it is now July of 2020. The earliest that you'd be available would be four more years. My question, I believe, was kind of simple. You think they should have to wait another four years.

A. Not at all. I don't understand.

N.T., 7/28/20, at 70–72.

Mindful of prevailing law, which emphasizes the Children's need for permanency and stability, our review reveals no error in the court's finding that termination serves the Children's best interests. *See* Trial Court Opinion, 9/17/20, at 12. The Agency caseworker testified that a parent-bond exists between Children and their pre-adoptive foster parents. N.T., 7/28/20, at 27–29. Our Supreme Court has stated that "[c]ommon sense dictates that courts

- 16 -

considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." **In re T.S.M.**, 71 A.3d at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." **Id.** at 269. It further observed that "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." **Id.**

Based on the record and applicable law, we discern no abuse of discretion by the court in determining that the Children's developmental, physical, and emotional needs and welfare will be served by the termination of Father's parental rights under Section 2511(b).

For the reasons stated above, we affirm the court's orders as to the Children's goal changes and the decrees terminating Father's parental rights pursuant to Section 2511(a)(2) and (b).

Orders affirmed. Decrees affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 03/17/2021